Filed 3/28/24  P. v. Vanatti CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LYNDEN VANATTI,<br><br>Defendant and Appellant. | F084336<br><br>(Super. Ct. No. BF172779B)<br><br>**MODIFICATION OF OPINION ON DENIAL OF REHEARING [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

It is ordered that the opinion herein filed on March 12, 2024, be modified as follows:

1.  At the beginning of the second sentence of the first full paragraph on page 26, change "Finley" to "McKenna".

This modification does not effect a change in the judgment.

The petition for rehearing is denied.

                                                          SNAUFFER, J.

WE CONCUR:


PEÑA, Acting P. J.


SMITH, J.

Filed 3/12/24  P. v. Vanatti CA5 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LYNDEN VANATTI,<br><br>Defendant and Appellant. | F084336<br><br>(Super. Ct. No. BF172779B)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Ian P. Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

On August 3, 2021, a jury convicted defendant Lynden Vanatti of the premeditated first degree murder of Allen Fagerson (Pen. Code, §§ 187, subd. (a), 189,

count 1),[1] and found true all enhancements and allegations, including the special circumstance the murder was intentional and was committed while Vanatti was an active participant in a gang, and that the murder was carried out in furtherance of the gang (§ 190.2, subd. (a)(22)). Vanatti was also convicted of dissuading a witness, Justin Becker, from making a report or testifying at trial (§ 136.1, subd. (c)(1) & (2), counts 3 and 4).[2] Subsequently, the trial court sentenced Vanatti to a term of life without the possibility of parole, plus an indeterminate term of 57 years to life and a determinate term of 15 years.

On appeal, Vanatti contends he is entitled to the benefit of newly enacted Assembly Bill No. 333 (2021-2022 Reg. Sess.) (AB 333), which amended the language of section 186.22, and added section 1109 requiring bifurcation, upon a defendant's request, of the trial on the gang enhancements and substantive gang offenses from that of the underlying offenses. Specifically, Vanatti argues the changes made by AB 333 require dismissal of his gang enhancements (§ 186.22, subd. (b)), the substantive gang offense (§ 186.22, subd. (a), count 5), and the gang-murder special circumstance allegation (§ 190.2, subd. (a)(22)), and that the failure to bifurcate the gang allegations constituted prejudicial error. The People concede the amendments made to section 186.22 apply retroactively and that the substantive gang offense (§ 186.22, subd. (a), count 5) must be dismissed, but argue the changes made by AB 333 do not apply to the gang-murder special circumstance allegation (§ 190.2, subd. (a)(22)) because any change constitutes an unconstitutional amendment to Proposition 21, and that "[s]ection 1109 applies prospectively only; [but] in any event, [Vanatti] was not prejudiced by the lack of bifurcation." During the pendency of this appeal, our Supreme

---

[1] Undesignated statutory references are to the Penal Code.

[2] As we discuss further below, Vanatti was also convicted and sentenced to additional offenses and enhancements.

Court held that "applying Assembly Bill 333's definition of 'criminal street gang' to the gang-murder special circumstance *does not* unconstitutionally amend section 190.22(a)(22) [Proposition 21]." (*People v. Rojas* (2023) 15 Cal.5th 561, 580 (*Rojas*), italics added.)

Further, Vanatti contends there was insufficient evidence (1) he was an active participant in the Aryan Brotherhood and (2) the murder was committed to further the activities of the gang requiring reversal of the gang-murder special circumstance allegation, the gang enhancements, and the substantive gang conviction. As to defendant's substantive gang offense conviction (count 5), the People concede there was insufficient evidence the murder actually promoted criminal activity by members of the Aryan Brotherhood gang.

Finally, Vanatti contends that "substantial evidence does not support a finding [he] intimidated any witness in violation of section 136.1, requiring reversal of the convictions of count[s] 3 and 4," and that his sentences as to counts 3 and 4 are erroneous requiring him to be resentenced. As to Vanatti's sentences on counts 3 and 4, the People concede error.

We accept the People's concessions, vacate the sentence, and remand for resentencing. Further, we conclude the entirety of AB 333 applies retroactively to Vanatti's case and, as to counts 1, 2, 3, 4, and 6, dismiss the section 186.22, subdivision (b)(1) enhancements, dismiss count 5 (§ 186.22, subdivision (a)), and as to count 1, dismiss the gang-murder special circumstance allegation pursuant to section 190.2, subdivision (a)(22). On remand, the People are not foreclosed from retrying Vanatti on the gang enhancements and gang-murder special circumstance

allegation,[3] and at resentencing the trial court shall reconsider Vanatti's sentences as to counts 3 and 4.  In all other respects, we affirm the judgment.

## STATEMENT OF THE CASE

On November 6, 2020, the Kern County District Attorney filed an information charging Vanatti[4] with premeditated first degree murder (§§ 187, subd. (a), 189, count 1) with the special circumstances he aided and abetted the individual who intentionally killed Fagerson while lying in wait (§ 190.2, subd. (a)(15)), that the murder was intentional and was committed while Vanatti was an active participant in a gang, and the murder was carried out in furtherance of the gang (§ 190.2, subd. (a)(22)); conspiracy to commit murder (§§ 182, subd. (a)(1), 187, count 2);[5] dissuading Becker by means of

---

[3] As we discuss in detail below, because both parties agree there was insufficient evidence to support the substantive gang offense charge (count 5) under the law in effect at the time of defendant's trial, the People are foreclosed from retrying defendant on count 5 on remand.  (See *United States v. DiFrancesco* (1980) 449 U.S. 117, 131 (*DiFrancesco*) ("the Double Jeopardy Clause prohibits retrial after a conviction has been reversed because of insufficiency of the evidence"]; *People v. Wetle* (2019) 43 Cal.App.5th 375, 388 (*Wetle*) (concluding that although it was necessary to reverse based on instructional error, it was also necessary to consider the defendant's insufficiency of the evidence claim to determine whether retrial is barred by double jeopardy principles].)

[4] Vanatti was charged as a co-defendant with Dustin Henthorn, William Leair, Jr., and Charles Colwell.

[5] Count 2 alleged the following overt acts in support of the conspiracy:

"Overt Act No. 1:    On July 20, 2017, Dustin Henthorn went into Allen Fagerson's cell.

"Overt Act No. 2:    On July 20, 2017, Dustin Henthorn stabbed Allen Fagerson.

"Overt Act No. 3:    On July 20, 2017, at least one defendant closed the door to cell 118 with Dustin Henthorn and Allen Fagerson inside.

"Overt Act No. 4:    On or before July 20, 2017, at least one defendant told Justin Becker not to warn anyone.

4.

force, or by an express or implied threat of force or violence from attending or giving testimony at a trial or proceeding (§ 136.1, subd. (c)(1), count 3); dissuading Becker from making a report to a correctional officer in furtherance of a conspiracy (§ 136.1, subd. (c)(2), count 4); active participation in the Aryan Brotherhood gang (§ 186.22, subd. (a), count 5); and conspiracy to commit an assault with a deadly weapon by a prisoner (§§ 182, subd. (a)(1), 4501, subd. (a), count 6).[6] As to counts 1, 2, 3, 4, and 6, it was further alleged these offenses were committed for the benefit of the Aryan Brotherhood gang (§ 186.22, subd. (b)(1)). Finally, as to all offenses, the information alleged three prior strike offenses (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d), 4501,

---

"Overt Act No. 5:    On or before July 20, 2017, at least one defendant told Justin Becker not to return to his cell th[r]ough the A-Side line.

"Overt Act No. 6:    On or before July 20, 2017, at least one defendant knew about writings made by Allen Fagerson.

"Overt Act No. 7:    On or before July 20, 2017, at least one defendant discussed Allen Fagerson's writings with another inmate.

"Overt Act No. 8:    On or before July 20, 2017, at least one defendant discussed Allen Fagerson's 'paperwork,' referring to his criminal history, with another inmate.

"Overt Act No. 9:    On or before July 20, 2017, at least one defendant discussed the possibility of Albert Rello committing a crime on Allen Fagerson.

"Overt Act No. 10:  On or before July 20, 2017, at least one defendant possessed the weapon used to stab Allen Fagerson.

"Overt Act No. 11:  On or before July 20, 2017, at least one defendant was a porter in Facility B.

"Overt Act No. 12:  On or after July 20, 2017, at leas[t] one defendant spoke to Michael Jones about the crime committed on Allen Fagerson."

[6] The overt acts alleged in count 6 were the same overt acts alleged in count 2.

subd. (a), 246, 459/460, subd. (a)) and three prior serious felony offenses (§ 667, subd. (a)).

On August 3, 2021, a jury found Vanatti guilty on all counts and found true all enhancements and allegations. As to both the alleged prior strikes and the prior serious felony offenses, the trial court in a bifurcated trial found true that Vanatti suffered these three prior convictions alleged in the information.

Subsequently, as to count 1, the trial court sentenced Vanatti to a term of life without the possibility of parole, plus 15 years for the three prior serious felony offenses (§ 667, subd. (a)). As to count 3, the trial court sentenced Vanatti to the upper term of four years, plus 15 years for the three prior serious felony offenses (§ 667, subd. (a)), and then tripled this term pursuant to section 667, subdivision (e)(2)(A)(i), for a total indeterminate term of 57 years to life, to run consecutive to count 1. As to count 2, the trial court sentenced Vanatti to a term of 25 years to life, and then tripled this term pursuant to section 667, subdivision (e)(2)(A)(i), for a total indeterminate term of 75 years to life, plus 15 years for the three prior serious felony offenses (§ 667, subd. (a)), but stayed this sentence pursuant to section 654. As to count 4, the trial court sentenced Vanatti to the upper term of four years, plus 15 years for the three prior serious felony offenses (§ 667, subd. (a)), and then tripled this term pursuant to section 667, subdivision (e)(2)(A)(i), for a total indeterminate term of 57 years to life, but stayed this sentence pursuant to section 654. As to count 5, the trial court sentenced Vanatti to an indeterminate term of 25 years to life, plus 15 years for the three prior serious felony offenses (§ 667, subd. (a)), but stayed this sentence pursuant to section 654. Finally, as to count 6, the trial court sentenced Vanatti to an indeterminate term of 25 years to life, plus a five-year term for the gang enhancement (§ 186.22, subd. (b)(1)), but stayed this sentence pursuant to section 654. The total aggregate sentence imposed was a term of life without the possibility of parole, plus an indeterminate term of 57 years to life and a determinate term of 15 years.

**SUMMARY OF FACTS**

## I.      The Prosecution Case-in-Chief

### A.      Background of the North Kern State Prison

Vanatti, Henthorn, Colwell, Leair, and Fagerson were inmates at the North Kern State Prison in Delano.[7]  The prison had four security levels, ranging from Level 1 minimum security to Level 4 maximum security.  The facility had two sides, "A" and "B," and two tiers, and the cell doors were controlled by a central operator.  The underlying murder took place at Facility B, which is a "reception center" where the staff "determin[ed] what facility w[ould] best suit [the inmate's] needs as far as security level and medical issues."  The facility housed general population inmates, which means the housed inmates "do not have any type of security concerns such as a sensitive need inmate or a protective custody inmate."

The prison was racially segregated between the white, black, and Hispanic inmates.  The white inmates[8] were controlled by the Aryan Brotherhood gang, which imposed a set of rules to be followed by the white inmates.  White inmates were required to "do hits" on individuals not following these rules.  Further, any crimes committed for the benefit of the Aryan Brotherhood had to be approved by the gang or the inmate who committed the crime would "get hit."  Finally, sex offenders and inmates who kill women and hurt children were not tolerated in the general population, and these individuals were usually removed from the general population to a sensitive needs yard.[9]

---

[7] Vanatti was also known as "Flea;" Henthorn was also known as "Doc;" Colwell was also known as "Natural;" and Leair was also known as "Johnny Boy."

[8] The white inmate population was known as the "Woodpile" or "Peckerwoods."

[9] The sensitive needs yard was repeatedly referred to throughout the record as "SNY."

7.

## B. Events Prior to the Stabbing

In July 2017, Vanatti and Henthorn were housed together in cell number 106. Vanatti introduced himself to other inmates as a member of the Nazi Lowriders gang and was in charge, alongside Leair, of the white inmates inside the building.

Fagerson was 57 years old, in poor health, and required the use of a walker. He was housed with Becker in cell number 118. Fagerson was identified as a "J-cat" – an individual who was "[a] little slow [and] [s]omeone who takes like psych meds, who just says things or does weird things that seem a little off compared to how most people in society would conduct themselves." He spent most of his free time writing poems for his granddaughter. These poems involved "[s]omething about a leprechaun and a trail . . . it was like a little kid story." Becker thought these poems were "kind of weird."

Four days before the murder, Fagerson traded some of his poems for coffee. These poems eventually ended up in the possession of both Vanatti and Henthorn. Thereafter, on July 19, 2017, Vanatti and Henthorn called Becker over to sit with them at a table. Vanatti asked Becker, " 'You know what is going to happen to your cellie tomorrow. Right?' " Becker responded, " 'What, are you guys going to move him?' " Vanatti replied, " 'No. Your cellie is going to die tomorrow.' " Becker "was kind of shocked, and it just made [him] scared." Vanatti then asked Becker if he was "willing to do it[,]" and Becker replied, "[N]o, I don't want to do it. I'm not a killer." Vanatti then told Becker, " 'It's okay, I've already got a hitter.' " Henthorn then told Becker that Fagerson needed to be killed because "he ha[d] like a 20-year-old [sex] charge." Vanatti and Henthorn also told Becker "not to go back to [his] cell and scream for help or yell for help; that they had the green light[10] and that this was a sanctioned hit; that [Fagerson],

---

[10] Becker testified a "green light" means "[t]hey have the go-ahead to do it" from the Aryan Brotherhood.

if [Becker] spooked [Fagerson] for any reason and he left the yard that [he] was going to be in trouble for it."

Later that night, Becker considered reporting this hit to the correctional officers and took out a piece of paper and "wrote in big bold letters 'Please help, my life is in danger.' . . . 'I need to be removed out of here ASAP.' "[11] However, Becker never showed this piece of paper to the correctional officers, nor did he warn Fagerson about the hit.

## C.   The Stabbing

Prior to the murder, Colwell slipped a sharp weapon under Vanatti and Henthorn's cell door. Vanatti and Henthorn then took turns sharpening the weapon.

On July 20, 2017, Becker walked laps in the yard with Henthorn when Henthorn told him "he was going to go in the cell and lock himself in the cell because he wanted to make sure that [Becker's] cellie died; that he was going to get washed up,[12] he knew it, and he didn't care." After Becker completed some laps, Vanatti approached him and said, "[W]hen the yard was recalled that they wanted [him] to return with the B side line and to go get in the back of the line of the whites and that when [they] came in the building that [he] could not go back to [his] cell." Moreover, Vanatti told him "to sit at a table in the dayroom and refuse to go back to [his] cell . . . [and he] wasn't allowed to say anything about why [he] was refusing but just to refuse."

Becker then entered the back of the line as instructed. He then told a correctional officer next to him, " 'Hey, they are going to whack my cellie right now. I am in B-1, in 118'. . . 'You guys need to send help.' " The correctional officer responded, " 'There's nothing I can do about it. Keep walking.' " Becker was frightened. Officers

---

[11] Officers later found this note in cell number 118. The note read, "[M]y life is in danger. Please help ASAP."

[12] Becker testified "washed up" means to get life in prison.

9.

subsequently placed Becker in handcuffs and transported him to a holding cell until he could be brought in for questioning.  Eventually, Becker told Sergeant T. Yoder "that his cellmate was going to be murdered."  Thereafter, Sergeant Yoder contacted the control booth officer to have an officer inspect cell number 118.

An officer then searched cell number 118 and found Henthorn "standing at the door, blocking the window view."  Henthorn "didn't have a shirt on, and he was sweaty and breathing heavily."  The officer asked Henthorn to move and Henthorn yelled, " 'It's [general population], motherfucker.' "  Eventually, the officer "saw Inmate Fagerson lying on the bottom tier or the bottom bunk face up, unresponsive [¶] [and he] s[aw] an object sticking out of his chest with blood around it, so [he] immediately hit [his] alarm."[13]

Officers then placed Henthorn in handcuffs and placed him in a holding cell.  At the holding cell, Henthorn "seemed happy, and he was actually laughing at the time." Henthorn told the officers, "I'll make it easy on you guys.  I was caught red-handed locked in that cell" and also to "make sure to get some [blood] from [his] right pinky nail. There is a . . . fat ass chunk of [Fagerson's] blood there."  Further, while Henthorn was being transported to another facility he told officers, "The women and children are safe again [¶] [t]he POS is dead."  He further explained:

> "That POS was a pedophile.  You know he did some shit back in the '70s.  That motherfucker showed me some kids' books that he was writing that was all about children.  I was molested when I was a kid.  He fucked up by showing me that shit."

Finally, as it related to the weapon, Henthorn asked the officers, "Did you like the finishing touches I left on [Fagerson]?"

---

**13** It was later determined Fagerson had been stabbed 75 times in the head, neck, shoulders, and chest.  Fagerson was later pronounced dead.  Forensic Pathologist R. Whitmore testified "[t]he cause of death [was] multiple stab wounds."

10.

### D. Vanatti's Statements

After the murder, Vanatti and Henthorn were placed in an administrative segregation unit. Inmate Michael Jones, an affiliate of the Aryan Brotherhood, ran this unit. Jones testified Vanatti told him all the specifics regarding the plan to murder Fagerson.

### E. Gang Evidence

Officer Farley testified as a gang expert. He testified the Aryan Brotherhood operates in every prison throughout California and is specific to "[t]he white race." "The Aryan Brotherhood basically opposes anybody that isn't the Aryan Brotherhood . . . [and] at the end of the day it's AB and nothing else to them. Anybody else would be either subservient or enemy." There are only 20-25 Aryan Brotherhood full members, "[b]ut as far as affiliates and active participants, it would be in the thousands." Further, the Nazi Lowriders (NLR) affiliate with the Aryan Brotherhood. "[T]here are still to this day former NLR members that are AB members . . . [and] in fact, AB members now, but at one point they were recruited from the NLR." Specifically, Officer Farley testified the NLR does still exist and that "the other loyal [NLR] faction stayed loyal to the Aryan Brotherhood; therefore, they are still walking the mainline." The primary activities of the Aryan Brotherhood are "[m]urder, conspiracy to commit murder, financial crimes, money laundering, distribution of narcotics, witness intimidation[,] [¶] [a]ssaults with deadly weapons, battery, battery on peace officers[,] [and] [¶] possession of illegal weapons."

#### 1. *Predicate Offenses*

In June 2013, inmate Jason Buckley, an active member of the Aryan Brotherhood, stabbed inmate Williams while inmates Smith and May punched and kicked Williams. Inmate Franklin Oden, who ran the white population in the building and was an active Aryan Brotherhood gang member, directed Buckley, Smith, and May to commit the assault. Oden was convicted of being an active participant in the gang while conducting

11.

felonious activities, and Buckley was convicted of assault with a deadly weapon with a gang enhancement.

In January 2014, inmates Michael Ellison, Richard Collins, and Aaron Edwards stabbed three other inmates during chapel time. Ellison and Collins were convicted of felony assault with a deadly weapon, whereas Edwards was convicted of misdemeanor assault with a deadly weapon. Officer Farley testified Ellison, Collins, and Edwards were active Aryan Brotherhood members at the time of the offense. However, Officer Cope testified Ellison was not an active member.

In December 2015, inmates Eric Knudsen and Chad Studebaker assaulted an inmate while at the yard. Knudsen was convicted of an assault likely to cause great bodily injury, while Studebaker was convicted of an assault with a deadly weapon. Both Knudsen and Studebaker were active members of the Aryan Brotherhood gang.

### 2. *Expert Opinion*

Officer Farley testified the Aryan Brotherhood targets sex offenders "to show their status amongst other races, other gangs, if you will, in the prison" and "[i[f you have been seen or known or it gets out that one of your leaders or members has a sex crime or you are allowing that within your ranks, the prison culture in itself will view that organization as weak and start preying upon . . . if you were labeled weak in prison." The Aryan Brotherhood's prohibition on sex offenders is both a "morality thing" and a "respect thing."

Further, Officer Farley testified to the following:

> "Based on all the testimony from multiple sources, different sources, and the terminology that they are using in their testimony, green lit, authorized, approved, and the dynamics of their testimony of how this was planned, I would say yes, yes. [Vanatti] was acting on behalf of the Aryan Brotherhood."

**DISCUSSION**

**I.     AB 333**

AB 333 amended the language of section 186.22 to modify the showing necessary to prove gang offenses and gang enhancements (Stats. 2021, ch. 669, § 3, eff. Jan. 1, 2022), and added section 1109, requiring bifurcation, upon a defendant's request, of the trial of gang enhancements and substantive gang offenses from that of the other underlying offenses.  (§ 1109, subds. (a), (b).)

**A.     Sections 186.22 and 190.2, subdivision (a)(22)**

Vanatti contends he is entitled to the benefit of newly amended section 186.22 and that the gang enhancements, substantive gang offense,[14] and gang-murder special circumstance allegation must be dismissed.  The People concede the amendments to section 186.22 apply retroactively, but disagree the gang-murder special circumstance must be dismissed because the Legislature could not unconstitutionally amend section 190.2, subdivision (a)(22), created by the voters via Proposition 21.  We conclude Vanatti is entitled to a dismissal of the gang enhancements and the gang-murder special circumstance allegation.  (*Rojas*, *supra*, 15 Cal.5th at p. 580.)  However, as we discuss in detail below, we also conclude the People are entitled to retry Vanatti on the gang enhancements and gang-murder special circumstance allegation, if they so choose.

**1.     *The Gang Enhancements (§ 186.22, subd. (b)) and Substantive Gang Offense (§ 186.22, subd. (a))***

As to counts 1, 2, 3, 4, and 6, the jury found true the gang enhancements (§ 186.22, subd. (b)), and as to count 5, the jury found Vanatti guilty of the substantive gang offense (§ 186.22, subd. (a)).  At the time of Vanatti's trial, "criminal street gang" was defined as "any ongoing organization, association, or group of three or more persons,

---

[14] As noted above, the People concede there is insufficient evidence to support the substantive gang offense (§ 186.22, subd. (a), count 5) and thus count 5 must be dismissed.

whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Former § 186.22, subd. (f).) AB 333 revised the definition of "criminal street gang" to require the members "collectively" (no longer "individually or collectively") engaged in a pattern of criminal activity. (§ 186.22, subd. (f); *People v. Clark* (Feb. 22, 2024, S275746) ___ Cal.5th ___, ___ [2024 WL 718741, *4] (*Clark*).)

Additionally, AB 333 redefined " 'pattern of criminal gang activity' " (§ 186.22, subd. (e)(1)), a necessary requirement for proving the existence of a "criminal street gang" and thus a "prerequisite to proving the gang crime and the gang enhancement." (See § 186.22, subds. (a), (b)(1); *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 823 (*Rodriguez*).) " 'The offenses comprising a pattern of gang activity are referred to as predicate offenses.' " (*Id.* at p. 822, quoting *People v. Valencia* (2021) 11 Cal.5th 818, 829.) At the time of Vanatti's trial, "pattern of criminal activity" meant "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (Former § 186.22, subd. (e).) Under this former definition, the prosecution only had to prove that those associated with a gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another. (Former § 186.22, subd. (e); see *People v. Sek* (2022) 74 Cal.App.5th 657, 665 (*Sek*).) "[I]t was unnecessary to prove predicate offenses were gang related." (*Rodriguez*, at p. 822; former § 186.22, subd. (e).)

14.

The amended statute made several changes to this definition and limited the type of predicate offenses sufficient to prove the gang enhancement and gang offense. "First, the predicate offenses now must have been committed by two or more 'members' of the gang (as opposed to any person). [Citation.] Second, the predicate offenses must be proven to have '*commonly* benefited a criminal street gang.' [Citation.] Third, the last predicate offense must have occurred within three years of the date of the currently charged offense. [Citation.] Fourth, the list of qualifying predicate offenses has been reduced. [Citation.] And fifth, the currently charged offense no longer counts as a predicate offense." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 477-478 (*E.H.*), italics in original); § 186.22, subd. (e)(1), (e)(2).) As our Supreme Court recently stated in *Clark*:

> "The Legislature's reference to collective engagement thus calls for an inquiry not just into how the predicate offenses benefited the gang, but also how the gang works together as a gang. It calls for a showing of a connection, or nexus, between an offense committed by one or more gang members and the organization as a whole. [¶] This organizational nexus may be shown by evidence linking the predicate offenses to the gang's organizational structure, meaning its manner of governance; its primary activities; or its common goals and principles." (*Clark*, *supra*, ___ Cal.App.5th at p. ___ [2024 WL 718741, *9], italics omitted.)

Finally, the new element that the predicate offenses "commonly benefited a criminal street gang" requires "the common benefit from the offenses is more than reputational." (§ 186.22, subd. (e)(1).) A new subdivision (g) was also added specifying that "[e]xamples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

### 2. *The Gang-Murder Special Circumstance (§ 190.2, subd. (a)(22))*

Further, as to count 1, the jury found true the gang-murder special circumstance (§ 190.2, subd. (a)(22)). Section 190.2, subdivision (a)(22) was enacted as a part of

Proposition 21, an initiative measure adopted by the electorate in the March 2000 primary election. (*People v. Shabazz* (2006) 38 Cal.4th 55, 65.) Section 190.2, subdivision (a)(22), makes first degree murder a capital crime if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, *as defined in subdivision (f) of Section 186.22*, and the murder was carried out to further the activities of the criminal street gang." (Italics added.)

Prior to *Rojas*, the Court of Appeal was divided as to whether AB 333 unconstitutionally amended Proposition 21. (See, e.g., *People v. Lee* (2022) 81 Cal.App.5th 232, 245, review granted Oct. 19, 2022, S275449 [AB 333 did not unconstitutionally amend Proposition 21]; *People v. Rojas* (2022) 80 Cal.App.5th 542, 553-558, review granted Oct. 19, 2022, S275835 [AB 333 did unconstitutionally amend Proposition 21].) During the pendency of this appeal, our Supreme Court resolved this dispute and held that "applying Assembly Bill 333's definition of 'criminal street gang' to the gang-murder special circumstance does not unconstitutionally amend section 190.22(a)(22) [Proposition 21]." (*Rojas*, *supra*, 15 Cal.5th at p. 580.) Therefore, we reject the People's argument AB 333 unconstitutionally amended Proposition 21. Further, because the jury instructions provided in this case omitted elements added by AB 333, we must decide whether this error was harmless.

### 3. *Prejudicial Error*

Although the People concede AB 333 applies retroactively to Vanatti's case, the People argue prejudice cannot be established because "substantial evidence support[s] [both] the gang[-murder] special circumstance allegation and [the] gang enhancements[.]"

As it relates to prejudice, the Fourth District, Division 2 in *E.H.*, stated the following:

> "Because Assembly Bill 333 essentially adds new elements to the substantive offense and enhancements in section 186.22—for example, by

16.

requiring proof that gang members 'collectively engage' in a pattern of criminal gang activity, that the predicate offenses were committed by gang members, that the predicate offenses benefitted the gang, and that the predicate and underlying offenses provided more than a reputational benefit to the gang—we agree with our colleagues in the Second District that the prejudice standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) applies. [Citations.] Under that standard, the absence of instruction on the amended version of section 186.22 requires reversal unless 'it appears beyond a reasonable doubt that the error did not contribute to th[e] jury's verdict.' " (*E.H.*, *supra*, 75 Cal.App.5th at p. 479.)

In order to prove harmless error under the *Chapman* standard, it is not enough to show that substantial or strong evidence existed to support a conviction under the correct instructions. As the United States Supreme Court explained in *Sullivan v. Louisiana* (1993) 508 U.S. 275, "the question . . . is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand . . . The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Id*. at p. 279, italics in original.)

Courts have found harmless error under this standard where the missing element from an instruction was uncontested or proven as a matter of law. For example, in *People v. Merritt* (2017) 2 Cal.5th 819, the trial court omitted the elements of robbery from the jury instructions, but the court held the error was harmless because the only contested issue at trial was the defendant's identity. (*Id*. at p. 832.) "Defendant knew what the elements of robbery were, and he had the opportunity to present any evidence he wished on the subject. '[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.' " (*Ibid*., quoting *Neder v. United States* (1999) 527 U.S. 1, 17.) Similarly in *People v. Vinson* (2011) 193 Cal.App.4th 1190, this court

17.

affirmed a defendant's petty theft conviction with a prior theft conviction even though the law had changed after trial to require proof of three prior convictions, rather than one. (*Id*. at p. 1200.) The defendant conceded he had suffered two prior convictions and his attorney stipulated at trial to a third conviction. Therefore, there was no dispute as to whether the new element in the law was proved. (*Ibid*.)

Here, we cannot conclude the jury instructions were harmless beyond a reasonable doubt. First, the 2013 predicate offense is the only offense that potentially satisfies newly amended section 186.22 because there was "evidence of a direct order from the gang to commit specific crimes." (*Clark*, *supra*, ___ Cal.5th at p. ___ [2024 WL 718741, *9]; see e.g. *People v. Lewis* (2021) 11 Cal.5th 952, 958 [the murder would have been agreed on at a meeting called by the gang's " ' "shot caller" ' "]; *In re Masters* (2019) 7 Cal.5th 1054, 1063 [a certain attack "would normally have been ordered only by the highest echelon of a gang's leadership"].) However, as to the other two predicate offenses, although the People proved the individuals were active members of the Aryan Brotherhood gang at the time of their offenses and were actively participating in the gang at that time, the People did not prove the predicate offenses commonly benefited the Aryan Brotherhood gang. (See *Clark*, *supra*, ___ Cal.5th at p. ___ [2024 WL 718741, *9]; § 186.22, subd. (e)(1) [" '[P]attern of criminal gang activity' [requires] . . . *two* or more of the following offenses"].) Second, the People's gang expert testified about several ways in which a crime could benefit a criminal street gang, but one of those benefits was reputational. When asked whether a murder could "keep control or keep power," i.e. enhance their reputation, the expert answered, "They do what's called overkill . . . they are going to make it . . . a blood bath." This is to instill "[i]ntimidation, fear" and to ensure the "other inmates or other races . . . out on the yard . . . see what these people do to their own people, [and] are not going to mess with them." In closing arguments, the People argued that the murder benefitted the gang as a whole because "when they come together and they commit a murder and they kill

18.

someone who violates the core values of the gang, it is unreasonable to think they did not intend to commit this with the gang in mind."  Although evidence of benefits to the gang beyond reputational benefit was introduced, we cannot rule out the possibility the jury relied on the reputational benefit to the gang as its basis for finding the gang enhancements, substantive gang offense, and gang-murder special circumstance allegation true.  Therefore, the instructional error was not harmless under the *Chapman* standard.  Accordingly, we dismiss the gang enhancement allegations (§ 186.22, subd. (b)), as alleged in counts 1, 2, 3, 4, and 6, and the gang-murder special circumstance finding (§ 190.2, subd. (a)(22)), as alleged in count 1.

### B.      Section 1109

Vanatti further contends that newly enacted section 1109 should apply retroactively to his case and thus, "[g]iven the retroactive application of section 1109, the trial court's failure to bifurcate the gang allegations [in] counts 1, 2, 3, 4, and 6, and the substantive gang charge alleged in count 5, at the request of the defense, violated the express mandate of section 1109 and constituted legal error."  The People contend "[s]ection 1109 applies prospectively only[, but] in any event, [Vanatti] was not prejudiced by the lack of bifurcation."

As we explain below, the trial court's failure to bifurcate pursuant to section 1109 was harmless because there is no basis to conclude bifurcation would have affected the outcome of the trial.  Accordingly, we need not consider both the issue of whether section 1109 applies retroactively[15] and the merits of Vanatti's bifurcation motion.

#### 1.      *Applicable Law*

"Pursuant to section 1109, subdivision (a), upon a defendant's request, a case in which a gang enhancement is charged under section 186.22, subdivision (b) or (d) must

---

[15] The issue of whether section 1109 applies retroactively to cases that are not yet final is currently under review by our Supreme Court in *People v. Burgos* (2022) 77 Cal.App.5th 550, review granted July 13, 2022, S274743.

19.

be tried in separate phases. Section 1109, subdivision (b) provides that '[i]f a defendant is charged with a violation of subdivision (a) of Section 186.22, this count shall be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime. This charge may be tried in the same proceeding with an allegation of an enhancement under subdivision (b) or (d) of Section 186.22.' " (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129 (*Ramos*).)

Section 1109 was added because:

> "(e) California courts have long recognized how prejudicial gang evidence is. [Citation.] Studies suggest that allowing a jury to hear the kind of evidence that supports a gang enhancement before it has decided whether the defendant is guilty or not may lead to wrongful convictions. [Citations.] The mere specter of gang enhancements pressures defendants to accept unfavorable plea deals rather than risk a trial filled with prejudicial evidence and a substantially longer sentence.

> "(f) Bifurcation of trials where gang evidence is alleged can help reduce its harmful and prejudicial impact." (Stats. 2021, ch. 669, § 2, subds. (e), (f).)

Vanatti's right to bifurcation under section 1109 is purely statutory. (*Ramos*, *supra*, 77 Cal.App.5th at pp. 1131-1133 [concluding section 1109 error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)].) " 'Typically, a defendant who has established error under state law must demonstrate there is a reasonable probability that in the absence of the error he or she would have obtained a more favorable result.' " (*People v. Anzalone* (2013) 56 Cal.4th 545, 553.)

In *People v. Tran* (2022) 13 Cal.5th 1169 (*Tran*), our Supreme Court held the failure to bifurcate pursuant to section 1109 is not structural error. (*Id*. at pp. 1208-1210.) The court also rejected the defendant's argument the *Chapman* standard for federal constitutional error applies, reasoning the admission of gang evidence in that case was not prejudicial that it rendered the trial " 'fundamentally unfair.' " (*Id*. at p. 1209.)

Instead, it evaluated the trial court's failure to bifurcate under the *Watson* standard. (*Id.* at pp. 1209-1210.)

## 2. *Harmless Error*

In assessing prejudice under *Watson*, "an appellate court may consider 'whether the evidence supporting the existing judgment is so relatively strong, and the evidence supporting a different outcome is so comparatively weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 870, italics omitted.)

Here, Vanatti "contends that in this case, the gang evidence had little relevance to any of the substantive offenses – namely, the charged murder, conspiracy to commit murder and assault, and dissuading a witness" and this evidence "is exactly the type of evidence that on its own created a substantial danger of inflaming the jury's passions by simply identifying [him] with such a group." We disagree. First, the evidence of Vanatti's guilt was overwhelming. Vanatti and Henthorn were housed together and Vanatti was in charge of the white inmates inside the building. Fagerson's poems ended up in the possession of both Vanatti and Henthorn, and Vanatti told Becker, " 'You know what is going to happen to your cellie tomorrow. Right? [¶] Your cellie is going to die tomorrow.' " Vanatti and Henthorn then told Becker to not go back to his cell and scream for help, and that if Fagerson was "spooked . . . for any reason . . . [Becker] was going to be in trouble for it." Subsequently, on the day of the stabbing, Vanatti approached Becker at the yard and laid out the plain for what Becker needed to do going forward. Inmate Jones also testified Vanatti told him about the plan to murder Fagerson. Finally, prior to the stabbing, both Vanatti and Henthorn took turns sharpening the murder weapon. The evidence was clear that once Vanatti received the "green light," it was up to him to plan and orchestrate the attack on Fagerson.

Second, evidence regarding Vanatti's Aryan Brotherhood gang membership was highly relevant for identity, motive, or intent under Evidence Code section 1101,

21.

subdivision (b). It was relevant for the jury to hear that Aryan Brotherhood gang members target sex offenders "to show their status amongst other races, other gangs, if you will, in the prison" and that the prohibition on sex offenders is based on the Aryan Brotherhood's sense of morality. Further, any potential prejudice from the gang evidence was mitigated when the trial court provided the jury with a limiting instruction regarding its consideration of the gang evidence, which we presume it followed. (*People v. Pearson* (2013) 56 Cal.4th 393, 414 ["We presume that jurors understand and follow the court's instructions"].)

Accordingly, we conclude Vanatti was not prejudiced by the failure to bifurcate the gang enhancements, gang offense, and gang-murder special circumstance allegations. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051 ["Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt."].) Therefore, we affirm Vanatti's conviction in its entirety. (See *E.H.*, *supra*, 75 Cal.App.5th at p. 480 [failure to bifurcate was harmless under *Watson* standard in light of " 'overwhelming' " evidence in support of the robbery convictions, stating "[e]ven if section 1109 applied retroactively to this case – an issue we need not and do not decide here – E.H. cannot show it is 'reasonably probable' he would have obtained a more favorable result if his trial had been bifurcated"].)

## II. Substantial Evidence Supports the Gang-Murder Special Circumstance Allegation and the Gang Enhancements.

Vanatti further argues there is insufficient evidence to support the gang findings necessary for the gang-murder special circumstance allegation (§ 190.2, subd. (a)(22)) and gang enhancements (§ 186.22, subd. (b)). While we are vacating the gang findings under AB 333, we must still address this claim to determine whether the gang-murder special circumstance allegation and gang enhancements may be retried on remand. (See *DiFrancesco*, *supra*, 449 U.S. at p. 131; *Wetle*, *supra*, 43 Cal.App.5th at p. 388.) As we

22.

explain below, we conclude these remaining gang findings were supported by substantial evidence under the law in effect at the time of Vanatti's trial.

### A. Applicable Law

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)

"There are two 'prongs' to the gang enhancement under section 186.22, subdivision (b)(1). [Citation.] The first prong requires that the prosecution prove the underlying felony was 'gang related.' [Citations.] The second prong 'requires that a defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members." ' " (*People v. Weddington* (2016) 246 Cal.App.4th 468, 484, fn. omitted (*Weddington*); former § 186.22, subd. (b)(1).)

Similarly, "[s]ection 190.2, subdivision (a)(22), by its express terms contains three basic elements: (1) the defendant must intentionally kill the victim; (2) while an active participant in a criminal street gang; [and] (3) in order to further the activities of the gang." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 612.) The language of section 190.2, subdivision (a)(22) "substantially parallels the language of section 186.22, subdivision (b)(1), which authorizes a sentencing enhancement for felonies 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with

the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .' " (*People v. Carr* (2010) 190 Cal.App.4th 475, 488 (*Carr*).)

Further, "[i]t has long been settled that expert testimony regarding whether a crime was gang related is admissible . . . [because] [s]uch matters are sufficiently beyond common experience that expert testimony would assist the jury." (*People v. Vang* (2011) 52 Cal.4th 1038, 1049, fn. 5 (*Vang*).) " 'Expert opinion that particular criminal conduct benefited a gang' . . . can be sufficient to support [both the gang enhancement under] section 186.22, subdivision (b)(1)" (*id.* at p. 1048), and the gang-murder special circumstance allegation (§ 190.2, subd. (a)(22)). (*Carr, supra,* 190 Cal.App.4th at pp. 488-490.)

Experts may be asked questions that coincide with the ultimate issue in a case (Evid. Code, § 805; *People v. Prince* (2007) 40 Cal.4th 1179, 1227), but they cannot offer an opinion on whether a defendant is guilty because "the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt." (*People v. Torres* (1995) 33 Cal.App.4th 37, 47; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.) Although the traditional method of eliciting opinion testimony from an expert witness is a hypothetical question based closely on the evidence of the case being tried (*Vang, supra,* 52 Cal.4th at p. 1046), an expert may also provide an opinion based on other witnesses' testimony presenting no factual conflicts or contradictions (*In re Collin's Estate* (1957) 150 Cal.App.2d 702, 712-715.)

### B.    Analysis

Specifically, Vanatti argues there was insufficient evidence that: (1) he was an active participant in the Aryan Brotherhood at the time of the murder and (2) that he specifically intended to promote and assist in the criminal activities of the Aryan Brotherhood. As to both claims, we disagree.

First, substantial evidence exists to support the jury's finding Vanatti was an active participant in the Aryan Brotherhood at the time of the murder. Vanatti identified

himself as an NLR gang member and took an active leadership role in the gang. Although there were only 20-25 full members of the Aryan Brotherhood, gang expert Officer Farley testified the NLR existed at the time of the murder and the NLR affiliated with the Aryan Brotherhood. At the time of the murder, Aryan Brotherhood "affiliates and active participants . . . would be in the thousands." Specifically, "the other loyal [NLR] faction stayed loyal to the Aryan Brotherhood . . . [and] they are still walking the mainline." Therefore, Vanatti's NLR membership established his association with the Aryan Brotherhood.

Further, Vanatti was in charge, alongside Leair, of the white inmates inside the building and was therefore responsible for enforcing the rules set by the Aryan Brotherhood. This leadership role was evidenced by the fact he himself received the "green light" from the Aryan Brotherhood for the "sanctioned hit" of Fagerson. Accordingly, a reasonable jury could have found Vanatti was an active NLR gang member who acted in a leadership role for the Aryan Brotherhood.

Nonetheless, Vanatti argues that "[i]t was undisputed [he] was not a validated member of the Aryan Brotherhood" and that the white inmates were required to follow the rules imposed by the Aryan Brotherhood "regardless of loyalty to the [gang], or suffer violent retribution." Although there was evidence Vanatti was a member of the Aryan Brotherhood, active gang membership is *not* required to support a true finding as to both the gang-murder special circumstance and the gang enhancements. (See § 190.2, subd. (a)(22); *People v. Sanchez* (2016) 63 Cal.4th 665, 698 [holding that pursuant to section 186.22, subdivision (b)(1), "gang membership is not an element of the gang enhancement"].) Therefore, the issue is not whether Vanatti was a member of the Aryan Brotherhood, but rather whether he actively participated in or committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang. Evidence regarding the Aryan Brotherhood was relevant to establish these issues irrespective of Vanatti's membership.

25.

Additionally, as noted above, Vanatti took an active leadership role in the Aryan Brotherhood. Officer Farley testified about the difference between a white inmate who simply followed the Aryan Brotherhood's rules[16] and an inmate who actively participated in the gang. Vanatti not only followed the rules of the gang, but rather took a position of power within the gang when he assumed control over the white inmates inside the building. He then orchestrated the plan to murder Fagerson by obtaining permission from the gang to commit the crime, and then subsequently recruited Henthorn to be the actual stabber. Accordingly, Vanatti was an active participant in the Aryan Brotherhood. (See *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130 ["[A]ctive participation in a criminal street gang . . . [requires] participation that is more than nominal or passive"].)

Secondly, substantial evidence exists to support the jury's finding Vanatti intended to promote, further, or assist in the criminal conduct of the Aryan Brotherhood. As to the first prong, there was substantial evidence the underlying felony was "gang related." (*Weddington*, *supra*, 246 Cal.App.4th at p. 484.) To be gang related, "[t]he offense may be committed (1) for the benefit of a gang; (2) at the direction of a gang; or (3) in association with a gang." (*Ibid*., italics omitted.) Here, Fagerson's killing benefited the Aryan Brotherhood because targeting sex offenders establishes the gang's "status amongst other races, other gangs . . . in the prison" and it was both a "morality thing" and "respect thing." Further, as noted above, this killing was done at the direction of and association with the Aryan Brotherhood because Vanatti was required to obtain the "green light" from the gang before orchestrating the attack.

The second prong requires a defendant to commit the underlying felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Former § 186.22, subd. (b)(1).) Intent for the second prong " 'is rarely susceptible of

---

[16] A white inmate who only follows the rules of the Aryan Brotherhood was referred to as a "programmer[]."

26.

direct proof and usually must be inferred from the facts and circumstances surrounding the offense.' " (*People v. Rios* (2013) 222 Cal.App.4th 542, 567-568.)  As noted above, Vanatti told Becker that Fagerson's murder was sanctioned by the Aryan Brotherhood Regardless, whether or not the Aryan Brotherhood in fact gave Vanatti the "green light" to murder Fagerson is irrelevant.  All that matters for intent is that Vanatti himself believed the Aryan Brotherhood sanctioned the murder.

Nonetheless, Vanatti argues the murder was not gang related because (1) Henthorn had a personal reason for killing Fagerson and (2) the Aryan Brotherhood had "in fact ordered no stabbings during th[e] time" of the murder.  Both of these inferences are reasonable from the record.  With that being said, "we must accept the reasonable inferences supporting the verdict over any inferences (even if reasonable) proffered by defendant." (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 15; see also *People v. Rundle* (2008) 43 Cal.4th 76, 137, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22. [holding that if there is substantial evidence supporting the verdict, it is insufficient for a defendant to cite to "various items of evidence in isolation . . . arguing each could be viewed as pointing to his innocence of the charge rather than his guilt . . . [e]ven if defendant's premise is correct . . ."].)

Therefore, we conclude substantial evidence supports both the gang-murder special circumstance and gang enhancements under the law in effect at the time of Vanatti's trial.  " 'Because we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial.  [Citations.]  " 'Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the reviewing court does not treat the issue as one of sufficiency of the evidence.' " ' " (*Sek*, *supra*, 74 Cal.App.5th at p. 669.)  Accordingly, apart from the substantive gang offense (§ 186.22, subd. (a), count 5), our decision does not bar the prosecution from retrying Vanatti on the gang-

27.

murder special circumstance finding (§ 190.2, subd. (a)(22)) and the gang enhancements (§ 186.22, subd. (b)(1)) on remand.

## III.  Substantial Evidence Supports the Jury's Verdicts as to Counts 3 and 4.

Vanatti further contends "substantial evidence does not support a finding [he] intimidated any witness in violation of section 136.1, requiring reversal of the convictions on count[s] 3 and 4."

### A.  Additional Factual Background

Vanatti was convicted of preventing and or dissuading a witness, Becker, in violation of section 136.1, subdivision (b)(1) (counts 3 & 4) and of doing so by threat and/or force (§ 136.1, subdivision (c)(1)).

As to counts 3 and 4, the jury was instructed with CALCRIM No. 2622, which instructed the jury as follows:

"The defendant is charged in Counts three and four with intimidating a witness in violation of Penal Code section 136.1(b)(1).

"To prove that the defendant is guilty of this crime, the People must prove that:

"1.    The defendant tried to prevent or tried to discourage Justin Becker from making a report that he or someone else was a victim of a crime to a correctional officer.

"2.    Justin Becker was a witness and/or crime victim;

"AND

"3.    The defendant knew he was trying to prevent or trying to discourage Justin Becker from making a report that he or someone else was a victim of a crime to a correctional officer and intended to do so.

"As used here, *witness* means someone or a person the defendant reasonably believed to be someone:

"Who knowns about the existence or nonexistence of facts relating to a crime;

28.

"A person is a *victim* if there is reason to believe that a federal or state crime is being or has been committed or attempted against him.

"It is not a defense that the defendant was not successful in preventing or discouraging the witness and/or crime victim.

"It is not a defense that no one was actually physically injured or otherwise intimidated." (Italics in original.)

Additionally, the trial court instructed the jury with CALCRIM No. 2623, which is as follows:

"If you find the defendant guilty of intimidating a witness, you must then decide whether the People have proved the additional allegations that the defendant acted maliciously and acted in furtherance of a conspiracy or used or threatened to use force.

"To prove these allegations, the People must prove that:

"1.    The defendant acted maliciously;

"AND

"2.    The defendant acted with the intent to assist in a conspiracy to intimidate a witness; or

"3.    The defendant used force or threatened, either directly or indirectly, to use force or violence on the person or property of a witness or a victim.

"Special instruction number one explains when someone is acting in a conspiracy to intimidate a witness. You must apply that instruction when you decide whether the People have proved this additional allegation.

"A person acts *maliciously* when he unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice.

"The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden for any allegation, you must find that the allegation has not been proved." (Italics in original.)

Finally, the trial court instructed the jury with a special instruction as follows:

29.

"I have explained that a defendant may be guilty of a crime if he either commits the crime or aids and abets the crime. He may also be guilty if []he is a member of a conspiracy.

"Defendants are charged in Count 4 with conspiracy to intimidate a witness, in violation of Penal Code section 136.1(c)(2).

"To prove that a defendant is guilty of this crime, the People must prove that:

"1.     The defendant intended to agree and did agree with one or more Defendants/co-conspirators (Dustin Henthorn and/or [Vanatti] and/or Charles Colwell) to commit the crime of intimidat[ing] a witness.

"2.     At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit the crime of intimidiat[ing] a witness.

"3.     One of the defendants and/or co-conspirators committed at least one of the following alleged overt acts to accomplish the intimidation of a witness: 1) Defendant Henthorn spoke to Justin Becker, 2) [Vanatti] spoke to Justin Becker, 3) At least one Defendant told Justin Becker not to warn anyone, 4) At least one defendant told Justin Becker not to inform Allen Fagerson, 5) At least one defendant told Justin Becker that Allen Fagerson was going to be killed.

"AND

"4.     At least one of these overt acts was committed in California.

"To decide whether a defendant committed these overt acts, consider all of the evidence presented about the acts.

"To decide whether a defendant and one or more of the other alleged members of the conspiracy intended to commit the intimidation of a witness, please refer to the separate instructions that I have given you on that crime.

"The People must prove that the members of the alleged conspiracy had an agreement and intent to commit the intimidation of a witness. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit that crime. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

30.

"An *overt act* is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime. The overt act must happen after the defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal act itself.

"You must all agree that at least one alleged overt act was committed in California by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts.

"You must make a separate decision as to whether each defendant was a member of the alleged conspiracy.

"Someone who merely accompanies or associates with members of a conspiracy but who does not intend to commit the crime is not a member of the conspiracy.

"Evidence that a person did an act or made a statement that helped accomplish the goal of the conspiracy is not enough, by itself, to prove that the person was a member of the conspiracy." (Italics in original.)

## B.     Applicable Law

In reviewing a claim of insufficiency of the evidence to support a criminal conviction, " 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496.)

Section 136.1, subdivision (b)(1) provides in part: "Except as provided in subdivision (c), every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by a imprisonment in county jail for not more than one year or in the state prison: [¶] (1) Making any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge." (§ 136.1, subd. (b)(1).)

31.

Section 136.1, subdivision (c)(1), which defines the aggravated form of the crime and subjects the perpetrator to higher penalties, provides in relevant part: "Every person doing any of the acts described in subdivision (a) or (b) knowingly and maliciously under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances: [¶] (1) Where the act is accompanied by force or by an express or implied threat or force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person [¶] [or] (2) Where the act is in furtherance of a conspiracy." (§ 136.1, subd. (c)(1), (2).)

### C. Analysis

Vanatti argues "the plain language of the statute criminalizes trying to prevent or dissuade another person 'who has been the victim of a crime or who is witness to a crime' from making any report 'of that victimization' to a correctional officer[,]" and thus, section 136.1 does not apply because "[t]he statements made to Becker did not refer to 'a crime;' rather, they referred to an assault or murder that had not yet happened." (Italics omitted.) Vanatti further argues "substantial evidence does not support a finding [he] intended to prevent or dissuade Becker from reporting a crime to a correctional officer." As to both arguments, we disagree.

### 1. *Section 136.1, Subdivision (c)(1) Applies to Both Completed and Ongoing Crimes*

Vanatti relies heavily on *People v. Reyes* (2020) 56 Cal.App.5th 972 (*Reyes*) in support of his first contention. In *Reyes*, the defendant was a deputy public defender who represented Olivas in the underlying matters. (*Id.* at p. 976.) In one of these matters, the trial court placed Olivas on probation and issued a protective order requiring him to stay 100 yards away from his mother, and to stay away from her home. (*Id.* at pp. 976-977.) Olivas was also " 'prohibited from having any "personal, electronic, telephonic, or

written contact" with [his mother], and prohibited from having contact with [her] "through a third party, except an attorney of record." ' " (*Id*. at p. 977.)

Subsequently, the district attorney charged the defendant with violating two witness tampering statutes, including dissuading a victim or witness from reporting a crime under section 136.1, subdivision (b)(1). (*Reyes*, *supra*, 56 Cal.App.5th at pp. 975, 979-980.) These charges were based on a preliminary hearing where, after issuance of the protective order described above, defendant contacted Olivas's mother, identified himself as " '[Olivas's ] district attorney,' " and told her that Olivas was going to be released that day, and if he was near or at her home, she should not call the police but instead should call the defendant. (*Id*. at pp. 977-978, 981.)

The preliminary hearing evidence was focused on an alleged attempt by the defendant to dissuade Olivas's mother from reporting a potential future crime (i.e. a possible future violation of the protective order by Olivas). (*Reyes*, *supra*, 56 Cal.App.5th at p. 984, fn. 7.) Although the prosecution also presented a theory the statute applied because of Olivas's ongoing abuse of his mother (*id*., at p. 984), the trial court granted the defendant's motion to set aside the information pursuant to section 995 and agreed with his position "the language of [section 136.1, subdivision (b)(1)] requires that the defendant attempt to dissuade the reporting of a *past crime*." (*Reyes*, at p. 980, italics added.)

On appeal, the First District, Division Four, affirmed the trial court's dismissal of the section 136.1, subdivision (b)(1) charge. (*Reyes*, *supra*, 56 Cal.App.5th at pp. 975, 981, 989.) The Court of Appeal summarized the issue as follows: "[W]hether section 136.1, subdivision (b)(1), should be construed to apply only to dissuasion of reports about completed crimes, as [the defendant] contends (and the superior court ruled), or should be construed more broadly to encompass future crimes as well, as the People contend (and the magistrate ruled)." (*Id*. at pp. 982-983.) After considering the parties' arguments, the Court of Appeal applied the "rule of lenity as a tool of last resort"

33.

and concluded that if defendant's "conduct on this record is a crime under section 136.1, subdivision (b)(1), the [trial] court correctly pointed out, 'we need the Legislature to tell us.' " (*Id*. at pp. 989-990.)

Two years later, this same court, in reference to *Reyes*, rejected defendant's argument that a violation of section 136.1, subdivision (b)(1) requires that a witness be prevented from reporting a completed crime, not an " 'ongoing' " crime. (*People v. Sherman* (2022) 86 Cal.App.5th 402, 413 (*Sherman*).) The *Sherman* court analyzed the statute and concluded that it "does not uniformly use the past tense to describe the underlying crime the reporting of which the defendant must have sought to prevent" and "the applicable definition of ' "[v]ictim" ' does not limit its coverage to a person who was victimized in the past[;] [citation] [i]nstead, it includes a person 'with respect to whom there is reason to believe that any crime . . . *is being* or has been perpetrated or attempted to be perpetrated.' " (*Id*. at p. 416, italics added.) Accordingly, "*Reyes* does not support [the defendant's] argument that section 136.1, subdivision (b)(1) cannot apply to an attempt to prevent a victim from calling the police during an ongoing crime such as an assault." (*Id*. at p. 413.)

Here, we find the *Sherman* analysis persuasive. Although Fagerson was not yet murdered when Vanatti dissuaded Becker from intervening, the conspiracy to attack and murder Fagerson had already begun. At the point at which Vanatti attempted to dissuade Becker from reporting, Vanatti had already received the "green light" for the "sanctioned hit" of Fagerson. Therefore, the conspiracy to murder was "ongoing" at the time Vanatti told Becker not to tip off Fagerson. (See *Sherman*, *supra*, 86 Cal.App.5th at p. 413.)

Furthermore, Vanatti was convicted of violating section 136.1, subdivision (c)(2), which enhances the sentence for witness dissuasion when "the act is in furtherance of a conspiracy." It is clear the Legislature intended not only to criminalize the act of dissuading a witness from reporting an ongoing conspiracy, but also to punish this type of act more harshly than that of simple witness dissuasion. This is not the type of case

34.

where " 'defendant allegedly sought to dissuade a witness from reporting a crime that had not yet occurred[,]' " (*Reyes*, *supra*, 56 Cal.App.5th at p. 987), but rather is one in which a conspiracy was already in full effect. Accordingly, substantial evidence supports the jury's verdict that Vanatti attempted to dissuade Becker from reporting an ongoing, active conspiracy to commit murder.

**2. *Vanatti's Statement to Becker Sufficiently Encompassed a Threat of Retaliation if Becker Reported the Ongoing Crime to Correctional Officers***

Vanatti further argues that "nothing from [his] directive supports a logical conclusion [he] intended to dissuade Becker from reporting the impending assault to a correctional officer," but rather "[t]he directive was not to spook Fagerson – in other words – not to give Fagerson a reason to ask for help, as made clear by Becker's testimony." (Italics omitted.) However, Vanatti told Becker "not to go back to [his] cell and scream . . . or yell for help" and that if Fagerson was "spooked . . . for any reason and he left the yard that [he] was going to be in trouble for it." Becker testified the only way for an inmate to leave the yard was to "fill out a . . . form and ask for help or medical form or he could go up to the cop and ask for help." It was reasonable for the jury to infer that Vanatti was threatening Becker not to tell a correctional officer about the plan to murder Fagerson, which in turn would have resulted in Fagerson being safely removed from the yard. Accordingly, a threat not to "spook" Fagerson encompassed a warning not to do anything to draw the correctional officer's attention to the plot to murder Fagerson. Accordingly, substantial evidence supports the jury's verdict as to counts 3 and 4.

**IV.    Vanatti's Sentences on Counts 3 and 4 Were Incorrectly Calculated.**

Lastly, Vanatti contends the trial court incorrectly calculated his sentences as to counts 3 and 4, and "[b]ecause the error affected multiple counts, the matter should be remanded for resentencing." The People concede error and agree Vanatti is entitled to be resentenced. Our conclusion as to the applicability of AB 333 renders this argument

moot because he is already entitled to a full resentencing. (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a court to revisit all prior resentencing decisions when resentencing a defendant"]; *People v. Buycks* (2018) 5 Cal.5th 857, 893 [" 'the full resentencing rule' "].) However, in anticipation of Vanatti's resentencing, we call to the trial court's attention to an error in the original sentence.

"The three options for calculating the minimum term of the life sentence (the 'minimum indeterminate term' or simply the 'minimum term') are set out in section 667, subdivision (e)(2)(A). 'Option 1' calculates the minimum term by tripling the term that would otherwise apply to the offense. [Citation.] The minimum term in 'Option 2' is 25 years to life. [Citation.] And 'Option 3,' sometimes referred to as the 'traditional sentencing' option, calculates the minimum term using normal determinate and indeterminate sentencing procedures, including enhancements. Under Option 3, the minimum term is '[t]he term determined by the court pursuant to [s]ection 1170 for the underlying conviction, including any enhancement applicable under Chapter 4.5 (commencing with [s]ection 1170) of Title 7 of Part 2, or any period prescribed by Section 190 or 3046.' " (*People v. Flores* (2021) 63 Cal.App.5th 368, 379-380 (*Flores*).)

"While the minimum terms under Options 1 and 3 will vary from case to case, Option 2 'essentially acts as a default to ensure that the defendant's indeterminate term will always be a minimum of 25 years.' [Citation.] Option 1 triples the term for the offense, and doesn't include enhancements, whereas Option 3 does include enhancements but doesn't multiply the base term for the offense by any number. [Citation.] As such, Option 1 will usually be the greatest 'when the current crime is particularly serious, and thus carries a significant sentence,' and Option 3 will generally yield the greatest minimum term 'when the defendant has an extensive criminal recidivist history, and hence there are numerous applicable enhancements.' " (*Flores*, *supra*, 63 Cal.App.5th at p. 380, quoting *People v. Dotson* (1997) 16 Cal.4th 547, 552-553, italics omitted.)

Here, as to count 3, the trial court imposed the upper term of four years, plus 15 years for the three prior serious felony offenses (§ 667, subd. (a)), and then tripled this result under section 667, subdivision (e)(2)(A)(i), for a total indeterminate term of 57 years to life. As to count 4, the trial court imposed this same sentence, but stayed it pursuant to section 654. These sentences were improperly calculated because section 667, subdivision (e)(2)(A)(i "triples the term for the offense, *[but] doesn't include enhancements.*" (*Flores*, *supra*, 63 Cal.App.5th at p. 380, italics added.) This rule applies to the five-year serious felony priors pursuant to section 667, subdivision (a). (*People v. Williams* (2004) 34 Cal.4th 397, 404-405 [section 667, subdivision (a) priors are enhancements].) The correct sentence under Option 1 is the four-year term tripled to 12 years. Accordingly, the longest of the three possible terms pursuant to section 667, subdivision (e)(2)(A) is 25 years. If applicable, the trial court may address this issue at Vanatti's resentencing.

## DISPOSITION

Vanatti's sentence is vacated and this matter is remanded for resentencing consistent with this opinion. Pursuant to Assembly Bill No. 333, we dismiss the gang enhancement allegations (§ 186.22, subd. (b)), as alleged in counts 1, 2, 3, 4, and 6; the substantive gang offense (§ 186.22, subd. (a), count 5); and the gang-murder special circumstance finding (§ 190.2, subd. (a)(22)), as alleged in count 1. Although the People are foreclosed from retrying Vanatti on the substantive gang offense (count 5), the People are not foreclosed from retrying Vanatti on the gang-murder special circumstance allegation and gang enhancements. Thereafter, the trial court is directed to file an

37.

amended and corrected abstract of judgment and transmit copies thereof to the appropriate authorities.  In all other respects, the judgment is affirmed.


                                                              SNAUFFER, J.

WE CONCUR:


PEÑA, Acting P. J.


SMITH, J.